FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 SEP 13 PM 4: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

CARL WRIGHT,                    )
                               )
        Plaintiff,             )
                               )        CIVIL ACTION NO.
v.                             )
                               )        CV-01-AR-2213-S
BELLSOUTH TELECOMMUNICATIONS,  )
INC.,                          )
                               )
        Defendant.             )

**ENTERED**

SEP 13 2001

## MEMORANDUM OPINION

The above-entitled case has an eery similarity to *Sherri Ashley v. BellSouth Telecommunications*, CV-00-C-3590-S, in which an Eleventh Circuit affirmance was received on September 5, 2001. The instant case was filed on August 31, 2001, by plaintiff, Carl Wright ("Wright"), against defendant, BellSouth Telecommunications, Inc. ("BellSouth"). The unpublished Eleventh Circuit opinion in *Ashley* is attached hereto as Exhibit "A", not because BellSouth's defenses in the instant case are the same as those in *Ashley* (BellSouth understandably has not interposed defenses that were rejected in *Ashley*), and not because *Ashley* is binding on this court, but because *Ashley*, together with other cases arising in the Northern District of Alabama and cited by Wright, show a pattern of judicial response to BellSouth's pertinent *modus operandi* that simply cannot be ignored.

On September 11, 2001, after the completion of the evidentiary

1

hearing on Wright's application for preliminary injunction and the matter taken under submission, BellSouth filed a motion to supplement the record. That motion has been granted. Because expedition is called for, and because Wright's request for a preliminary injunction is being granted by separate order, the court is not waiting for Wright to respond to BellSouth's supplementary evidence. He may or may not have a response.

### Findings of Fact

The material facts are largely undisputed.

Wright is 48 years old. He has worked for BellSouth 23 years in a variety of jobs. He has had, and perhaps still has, orthopedic problems. He has had a lower bowel resection as a result of colon cancer. Suffering severe abdominal pain, he recently underwent an emergency operation for an intestinal obstruction. He has sarcoidosis. He has hypertension. He suffers from depression. He is on several medications, including prednisone. He has a pending claim for Social Security disability benefits. He was awarded unemployment benefits by the State of Alabama without opposition by BellSouth after this action was filed. His primary treating physician has described him as totally disabled and unable to work.

BellSouth's short-term disability plan defines "disability" as the inability to perform any job task and not just the inability to perform the job that the complaining employee was performing before his claim of disability. BellSouth is self-insured for disability

2

benefits, but Kemper Insurance Company ("Kemper") is the plan administrator, and as such, is responsible for making all decisions respecting disability claims. Initially, Kemper approved disability payments to Wright, meaning that during a period of time, Kemper agreed with Wright's assertion that he could not perform **any** job task.   There is a difference of opinion as to the level of cooperation and communication between Wright and his physicians, on the one hand, and Kemper and BellSouth on the other. Who is at fault for this failure of communication in the processing of medical information on Wright's condition, may or may not be relevant to the ultimate outcome of Wright's disability benefits claim. Suffice it to say, however, that Kemper finally informed Wright and BellSouth of its conclusion that Wright is no longer qualified for disability benefits.   After obtaining this information, Wright's supervisor, Derek Kennedy ("Kennedy"), instructed Wright to report for work. Wright was then in the process of challenging Kemper's denial of benefits and was following the administrative procedures available to him as required under the plan and ERISA. Kennedy testified that he did not know that Wright was appealing the denial of benefits. Kennedy furthermore testified that he does not now know if he would have terminated Wright if he had known of Wright's appeal. Termination had the effect, or will have the effect unless there is judicial intervention, (1) of eliminating Wright's basic income, whether disability income or wages, (2) of eliminating Wright's

3

medical insurance coverage, and (3) of eliminating the accrual of pension benefits, a right that is now vested but will not become payable until Wright reaches the age of 65, **if** he reaches that age, a highly conjectural matter considering the state of his health.

The determinative or ultimate fact **in this case**, a fact which this court deduces from the foregoing sub-facts, is that BellSouth, to some degree, was motivated in its decision to terminate Wright by its policy or desire to minimize its exposure to its costs for providing medical benefits and pension benefits. BellSouth may have had other, unproscribed motives for terminating Wright, but this particular motive is proscribed by 29 U.S.C. §1140. BellSouth's careful proof of the cost to it of providing medical coverage and pension contributions for "employees" constitutes proof enough of a connection between Wright's termination and BellSouth's desire to avoid the cost of ERISA protected benefits.

### Conclusions of Law

This court has jurisdiction over this case, which presents a federal question.

It goes without saying, but the law of preliminary injunctions requires that it actually be said in order for an injunction to issue, that Wright will suffer irreparable injury if BellSouth is successful in terminating him before his disability claim is resolved and while it is being processed. Termination would be catastrophic for Wright. The final decision made on Wright's ERISA

governed disability claim may or may not be that he is qualified for disability benefits, but this court is not required at this juncture to make that final decision or to try a future ERISA benefits case, although the issues overlap somewhat.   This court is only responsible for finding, as it now does find, that there is a sufficient likelihood of success to justify the preservation of the *status quo* while Wright exhausts his review procedures on the disability administrative track.   The time within which a final determination of Wright's entitlement to disability benefits will be made may be short, or it may be long, but the court finds that Wright has a substantial probability of succeeding at some stage of that proceeding.   In balancing the possible harms to the parties if an injunction is issued, BellSouth will sustain some unrecoverable costs if an injunction is issued, but only if the amount of an injunction bond is insufficient to protect BellSouth. Nevertheless, a balancing of harms weighs heavily in favor of Wright, who will be virtually destroyed by being terminated with no disability benefits and no medical benefits.   The recent award of unemployment compensation is not enough to change this conclusion, although it provides fodder for future argument.  Furthermore, there is nothing adverse to the public interest in granting a preliminary injunction, particularly when the Eleventh Circuit in *Ashley*, as recently as August 30, 2001, affirmed the granting of a preliminary injunction under not dissimilar circumstances, and when medical insurance

coverage for Wright may keep him out of a taxpayer funded charity hospital.

Last but not least, Wright has no adequate remedy at law.  If ERISA did not super-preempt all possible extracontractual claims by Wright (or by his estate in the event he should die as a proximate consequence of a denial of medical coverage), there might be an adequate remedy at law, but under the actual circumstances the preservation of the *status quo* is the only judicial response that makes any sense, that is, unless there is no remedy and the Catch-22 doors close on Wright.

Based on these conclusions, a preliminary injunction will issue by separate order.

DONE this _____13th_____ day of September, 2001.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

6

[DO NOT PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE ELEVENTH CIRCUIT

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

AUG 3 0 2001

THOMAS K. KAHN
CLERK
```

No. 01-10372
Non-Argument Calendar

D. C. Docket No. 00-03590-CV-C-S

SHERRI ASHLEY,

Plaintiff-Appellee,

versus

BELLSOUTH TELECOMMUNICATIONS, INC.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Alabama

(August 30, 2001)

Before EDMONDSON, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

BellSouth Communications, Inc. ("BellSouth"), appeals the district court's order

granting a preliminary injunction enjoining it from terminating the employment of Sherri

EXHIBIT "A"

Ashley pending the outcome of her administrative appeal of the denial of short-term and long-term disability plan benefits. On appeal, BellSouth alleges that: (1) the district court did not have subject matter jurisdiction to grant the injunction; (2) the district court erred by excusing Ashley's failure to first exhaust her administrative remedies prior to filing this suit; and (3) Ashley failed to satisfy the prerequisites for issuance of a preliminary injunction.

We review a challenge to the district court's subject matter jurisdiction de novo. See Bishop v. Reno, 210 F.3d 1295, 1298 (11th Cir. 2000). The district court's decision to apply or not apply the exhaustion of administrative remedies requirement for ERISA claims is a highly discretionary decision which we review only for a clear abuse of discretion. See Perrino v. Southern Bell Tel. & Tel. Co., 209 F.3d 1309, 1315 (11th Cir. 2000). We review a district court's granting of a preliminary injunction for abuse of discretion. See Securities & Exch. Comm'n v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1198 (11th Cir. 1999).

Upon thorough review of the record, as well as careful consideration of the parties' briefs, we can find no reversible error and affirm.

The relevant facts can be briefly stated. Ashley was an employee of BellSouth for 22 years. Her most recent position was as a service representative. During her employment, Ashley participated in BellSouth's Short Term Disability Plan ("STDP"),

2

which was funded by BellSouth and administered by a third party, Kemper National

Services ("Kemper"). The STDP provides that employees are eligible to receive benefits

if they (1) "have attained six full months of net credited service," and (2) "are disabled

and are unable to perform any type of work as a result of physical or mental illness or

an accidental injury." "Any type of work" is defined as "your regular job with or

without accommodations, any other participating company job (regardless of availability)

with or without accommodations, or temporary modified duties." Pursuant to the STDP,

based on her 22 years of employment at BellSouth, Ashley was eligible for up to 39

weeks of full pay and for up to 13 weeks of half pay.

After BellSouth placed Ashley on short term disability, on August 28, 2000,

BellSouth's independent medical examiner, Dr. Charles Whetsell, completed a Mental

Disorders Fitness for Duty Report, diagnosing Ashley with Posttraumatic Stress Disorder

and Bipolar Disorder. Dr. Whetsell further opined that Ashley "clearly has significant

symptoms of mental distress."

On October 2, 2000, Ashley returned to work, but on October 11th, she suffered

a panic and anxiety attack, resulting in her loss of consciousness. On the following day,

her psychologist found that she was totally disabled and advised her not to return to

work. Thereafter, on October 27, 2000, BellSouth informed Ashley that she was not

3

disabled, and that she must return to work by November 1, 2000 or provide the plan administrator (Kemper) with evidence of a disability by that date.

On October 27th, Ashley submitted additional medical evidence, including her psychologist's diagnosis that she was 'totally disabled" and could not work. Nevertheless, on November 2, 2000, BellSouth terminated Ashley for her failure to return to work. Six days later, on November 8, 2000, Ashley sent Kemper a letter formally appealing the denial of benefits. After her termination, Ashley was without health insurance and life insurance. Thereafter, she was required to pay a $621 monthly premium to get COBRA coverage. Her appeal from the denial of benefits is currently pending. She filed this action seeking preliminary injunctive relief to prevent BellSouth from terminating her employment, and consequently, her insurance, until resolution of her appeal from the denial of benefits.

On appeal, BellSouth first argues that the anti-injunction provisions of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. §§ 101 et seq., deprived the district court of jurisdiction over a labor dispute for injunctive relief where the complainant has not first participated in voluntary arbitration. In particular, BellSouth relies upon section 4, which provides in part as follows:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are

4

herein defined) from doing, whether singly or in concert, any of the following acts: ... (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value....

29 U.S.C. § 104. BellSouth urges that although Ashley characterized her suit as one involving ERISA, in reality, her claim was one for wrongful termination of employment and was governed by the NLGA, which defines a "labor dispute" as "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c). We disagree.

Congress enacted the Norris-LaGuardia Act in 1932 to limit the availability of injunctive relief in conflicts arising out of labor disputes. Courts are powerless to issue injunctions in labor disputes except "in strict conformity with the provisions of [the Act]." 29 U.S.C. § 101. The NLGA enumerates specific conduct that courts cannot enjoin, and prescribes rigid procedural requirements for the issuance of injunctive relief in cases not involving such conduct. See 29 U.S.C. §§ 107, 109 (1973).[1] Notably, for purposes of the present issue, refusal to pay short term disability benefits pending the

---

[1]    Sections 7 and 9 of the Norris-LaGuardia Act establish the procedural requirements for the issuance of an injunction in a case growing out of a labor dispute. These requirements include the following: (1) A hearing in which witnesses testify in open court, including an opportunity for cross-examination; (2) Substantial and irreparable injuries; (3) A showing that the injury to the moving party from denial of relief is greater than the injury to the nonmoving party by granting the relief; (4) A finding of no adequate remedy at law; (5) The issuance of findings of fact by the court prior to granting the application for an injunction; and (6) Adequate security sufficient to recompense those enjoined for damages caused by the order. See 29 U.S.C. §§ 107, 109.

outcome of a plan participant's appeal from an employer's denial of benefits does <u>not</u>
fall within one of the categories of specifically enumerated acts.

ERISA, on the other hand, specifically addresses the termination and denial of
related benefits and enumerates an employee's cause of action for an injunction to
restore those benefits.  ERISA prohibits the discharge of "a participant or beneficiary .
. . for the purpose of interfering with the attainment of any right to which such participant
may become entitled under the plan." 29 U.S.C. § 1140.  To that end, ERISA allows for
civil enforcement of its provisions by "a participant, beneficiary, or fiduciary (A) to
enjoin any act or practice which violates any provision of this subchapter or the terms
of the plan, or (B) to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3).

Of course, in a very technical sense, a request for an injunction to prevent
termination and to compel payment of insurance benefits arises out of a "labor dispute."
However, thus construed, the NLGA would always foreclose the equitable relief made
available under ERISA.  The approach of courts in similar cases suggests that injunctive
relief <u>is</u> available under ERISA without compliance with the strict procedural
requirements of the NLGA.

For example, the Sixth Circuit reversed the district court's denial of an injunction
requiring future trust fund contributions without mentioning the Norris-LaGuardia Act
procedures in <u>Laborers Fringe Ben. Funds--Detroit & Vicinity v. Northwest Concrete &</u>

6

<u>Constr., Inc.</u>, 640 F.2d 1350, 1352 (6th Cir. 1981) (per curiam).  Instead, the Sixth Circuit focused on the need to provide adequate remedies under ERISA, noting that ERISA's purpose of stabilizing the rights and liabilities involved in benefit plans established under collective bargaining agreements would be frustrated unless the enforcement provisions of ERISA were liberally construed. <u>Id.</u> at 1352; <u>see</u> also <u>Van Drivers Union Local No. 392 v. Neal Moving & Storage</u>, 551 F. Supp. 429 (N.D. Ohio 1982) (preliminary injunction granted under ERISA without reference to the Norris-LaGuardia Act).

Moreover, the Supreme Court has noted that "[t]he prohibitions of the NLGA must give way when necessary to enforce a duty specifically imposed by another statute." <u>Pittsburgh & Lake Erie R. Co. v. Railway Labor Eexecutives' Ass'n</u>. 491 U.S. 490, 514, 109 S. Ct. 2598, 105 L. Ed. 2d 415 (1989).  Simply put, the injunctive relief sought under Ashley's ERISA claim is not the type of injunction that the Norris-LaGuardia Act was intended to preclude.  It is clear that the Norris-LaGuardia Act "was designed in large measure to prevent federal courts from enjoining the legitimate exercise of the rights of American workers created and protected by the National Labor Relations Act." <u>Briggs Transp. Co. v. Teamsters</u>, 739 F.2d 341, 344 (8th Cir. 1984).  An examination of the purposes and legislative history of the Norris-LaGuardia Act and specifically section 104(c) evidences that that section was <u>not</u>

7

intended as a protection for employers, as BellSouth urges here. Indeed, § 102 of the Act commands the courts to interpret the statute in light of the Act's policy to protect the legitimate exercise of the rights of workers. The district court was not deprived of jurisdiction over this ERISA suit by virtue of the NLGA.

Next, BellSouth argues that Ashley failed to exhaust available grievance and arbitration remedies provided in the collective bargaining agreement that governed the terms and conditions of her employment, and that the district court erred by excusing the exhaustion of administrative remedies as a prerequisite to this action. We have consistently held that plaintiffs must exhaust their administrative remedies under a covered benefits plan prior to bringing an ERISA claim in federal court. See Byrd v. MacPapers, Inc., 961 F.2d 157, 160-61 (11th Cir. 1992); Springer v. Wal-Mart Associates' Group Health Plan, 908 F.2d 897, 899 (11th Cir. 1990); Mason v. Continental Group, Inc., 763 F.2d 1219, 1227 (11th Cir. 1985). Nevertheless, a district court has broad discretion to excuse a plaintiff's failure to exhaust available administrative remedies. See Perrino, 209 F.3d at 1315. Here, the collective bargaining agreement, upon which BellSouth relied for its argument that Ashley was required to arbitrate her claim prior to filing suit, indicates that benefit denials may be the subject of a grievance. On this record, we can find no clear abuse of the district court's broad discretion to excuse exhaustion of administrative remedies.

8

Finally, BellSouth urges that the district court erred by issuing a preliminary injunction because Ashley failed to satisfy the criteria for issuance of injunctive relief. We disagree. First, BellSouth's termination of Ashley's health insurance, pending the outcome of her appeal from the denial of short term benefits, suffices to establish irreparable harm. "[T] o presume that one not able to afford health insurance coverage is harmed only in a monetary sense is to ignore the realities of the situation . . . [t]he effects of delay in obtaining medical attention or of purchasing inadequate medical coverage are all incapable of being easily measured." Carbal v. Olsten Corp., 843 F. Supp. 701, 703 (M.D. Fla. 1994)(internal quotation marks and citation omitted); see also Communications Workers of Am. v. Nynex, 898 F.2d 887, 892 (2d Cir. 1990)(holding that "acts that result in a denial of covered treatment justify a finding of irreparable harm").

We are likewise unpersuaded by BellSouth's argument that Ashley did not sufficiently establish a likelihood of success on the merits of her claim. The district court found that "BellSouth discharged Plaintiff to avoid paying further disability benefits." BellSouth has not established reversible error in the district court's preliminary injunction order.

**AFFIRMED.**

9